## SOUTHERN RAILWAY COMPANY *v.* COMBS.

1. Every thoroughfare which is used by the public and is common to all the public, and which the public has a right to use, is a highway.
2. A highway may have its origin in a legislative act, or in the order of a court of competent jurisdiction, or may come into existence by dedication or by prescription.
3. A public road, within the meaning of the "blow-post" law, is a highway originating in one or the other of the methods above referred to.
4. The words, "established pursuant to law," appearing in the Civil Code, §2220, following the words, "the public roads or private ways," limit and qualify only the words, "private ways," and have no reference to the words, "public roads."
5. There was no error in the rulings on the admission of evidence, the charges complained of were not erroneous for any reason assigned, the evidence authorized the verdict, and no sufficient reason has been shown for reversing the judgment.

Argued January 26,—Decided February 19, 1906.

Action for damages. Before Judge Reagan. Henry superior court. August 7, 1905.

W. J. Combs brought suit against the Southern Railway Company, and alleged: On September 5, 1900, there existed near petitioner's residence, in Henry county, a public-road crossing, where

the Peeksville and Hampton public road, legally recognized as a
public road for thirty years, more or less, crossed the track of the
defendant at the same grade, and was recognized by it as a public
road.   On September 5, 1900, two mules and a wagon of petitioner
were being driven by his servant over the crossing, when they were
struck by a train of the defendant, and the mules were killed, the
wagon was demolished, and the harness destroyed.   The train ap-
proached and ran over the crossing at a speed of thirty miles an
hour, without checking its speed; no bell was rung, no whistle
blown, nor other warning given.   A cut prevented the driver from
seeing the approaching train until too late for him to get off the
track.   By amendment the plaintiff alleged, that the public-road
crossing over the defendant's track was used and maintained by the
public, and persons were accustomed to pass over the track at that
point with the full knowledge of the defendant, and that the cross-
ing was built and maintained by the defendant.   At the trial there
was evidence that the whistle of the locomotive was not blown, nor
the speed of the train checked, when the train was approaching the
place where the mules were killed, and that the road which crossed
the railroad at that point was at that time and had been for many
years—according to some of the testimony, upwards of thirty years
—in use by the public as a road for wagons, etc., and had been
worked during that time by the county authorities as a public road.
To this evidence counsel for the defendant objected, contending
that such use and working of the road would not make it a public
road, in the meaning of the "blow-post" law, as contained in the
Civil Code, §2220 et seq.; that before that law would apply, it was
necessary that the road should be established as a public road in the
manner provided by law.   The verdict was for the plaintiff.   The
defendant moved for a new trial, on the general grounds, and on
numerous grounds relating to the admission of the evidence men-
tioned, and to the admission of evidence as to the thickly-settled
character of the locality in which the mules were killed; also on the
grounds that the court erred in giving in charge the "blow-post"
law, and in charging that if the jury should believe that the road
was used by the public twenty years, or more, as a public road, and
that the county authorities recognized it as a public road and
caused it to be worked at the public expense as such for that length
of time, it would be presumed that the road had been established

according to law. The motion was overruled, and the defendant excepted.

*Charlton E. Battle,* for plaintiff in error.

*J. F. Wall* and *E. M. Smith,* contra.

COBB, P. J. (After stating the facts.) 1-4. The term "highway," in its popular sense, is a road or way open to the use of the public; a main road or thoroughfare. Webster's Int. Dict. A way open to all the people is a highway. Though every public thoroughfare is a highway, it is not essential that every highway should be a thoroughfare. Elliott on Roads and Streets (2d ed.), §1 et seq. A road which leads only to the residence of a single individual may be a highway. Every thoroughfare which is used by the public, and, in the language of the English books, is common to all the king's subjects, is a highway. 15 Am. & Eng. Enc. Law (2d ed.), 350. Highways are created by legislative authority, by dedication, or by prescription. The construction of the term "highway," when used in a statute, depends upon the legislative intent, and no fixed rule in regard to its meaning can be given. The term "road" is frequently used as synonymous with "highway," but it does not appear to have any fixed legal meaning. 15 Am. & Eng. Enc. Law (2d ed.), 350 et seq. In order to properly determine what is a public road within the meaning of the blow-post law as contained in the Civil Code, §§2220 et seq., it becomes necessary to take a review of the legislation finally culminating in these sections. In 1838 the General Assembly passed an act with the following title: "To amend the road laws of this State, so far as to cause to be kept in good repair all places where any railroad which now is or hereafter may be chartered crosses or may cross *any public highway* in this State." The act made it the duty of all railroad companies "to put and keep in good travelling order and repair the public roads at such point or points where the same may be crossed by their respective railroads;" and then proceeded to provide the method for removing obstructions from such crossings, and requiring the railroad companies to put the crossings in good condition for travel. Acts 1838, p. 216; Cobb's Dig. 955. No further duty in reference to the crossings than that of maintenance in good order was imposed by this statute. The duty of a railroad company to erect blow-posts and give signals of the approach of trains at

crossings had its origin in the act of January 22, 1852 (Acts 1852, page 108). On December 14, 1851, there was, at a road crossing in Monroe county, a collision between the train of the Macon and Western Railroad Company and a carriage, containing a lady and her four children, driven by a negro slave, which resulted in the death of two of the children and the driver, and serious injuries to some of the other occupants. The catastrophe was of such a distressing nature that the General Assembly, then in session, promptly passed the act above referred to. This accident was the foundation of the cases of *M. & W. R. Co.* v. *Davis,* 18 *Ga.* 679, *M. & W. R. Co.* v. *Winn,* 19 *Ga.* 440, and *M. & W. R. Co.* v. *Winn,* 26 *Ga.* 250. The title of the act of 1852 was, "An act to prescribe certain rules and regulations to be observed by railroad companies in running engines upon their respective tracks, and fixing a penalty for violating the same." The act provided that the several railroad companies in this State should be required, by the first of February following, to prepare and put up sign-boards, parallel with their tracks, "over each and every public road where the same crosses the railroad track," with the following words painted thereon in large letters: "Look out for the engine when the whistle blows." It also provided that there should be fixed on the line of the track, at a distance of 200 yards from the center of each public road, on each side of the road, a post, and the engineer should be required, when he arrived at either of the posts, to blow the whistle of the engine until the engine arrived at the public road, and, moreover, check the speed of the engine so that the same might be stopped should any person or thing be crossing the track on the public road. A failure to erect these sign-boards and posts was declared to be a misdemeanor, for which the president and directors of the company were indictable. The failure of the engineer to comply with the provisions of the act was also declared to be a misdemeanor. By an act approved December 17, 1859 (Acts 1859, p. 64), the act of 1852 was so amended as to repeal that provision in reference to the sign-boards, and to require the blow-posts to be placed at a distance of 400 yards from "the center of each public road on each side of said road;" making the president and directors indictable only for failure to erect the posts. That portion of the act of 1852 which required the engineer to blow and check as he approached the crossing, and making him indictable for failure to comply with these

provisions of the act, was unaffected by the act of 1859. Such was the condition of the law in regard to the duty of railroad companies in reference to the maintenance of public-road crossings, and the manner of operating their trains over the same, at the time that the Code of 1863 went into effect. The duty in regard to maintenance of public-road crossings had its origin in the act of 1838, which made no reference to the manner in which trains should be operated over the crossings, and this duty applied to all public roads. As indicated by the title of the act, the term "public roads" was used in the sense of "highways." The acts of 1852 and 1859 make no reference whatever to the act of 1838, but in each of the three acts the provisions are such as to be applicable to "each public road" in this State. There is no reference whatever in any of these acts to private ways, nor anything to indicate a classification of public roads.

The compilers of the Code of 1863 placed in one article, under the title "Railroad and other crossings," the different provisions of law in reference to railroad crossings. A large part of this title is traceable directly to the three acts above referred to, though there were some changes made by the compilers. The act of 1838 finds expression in the Code of 1863, § 678, which has been brought forward into the Code of 1895, as § 2220, in the exact language in which it appeared in the Code of 1863, which is as follows: "All railroad companies shall keep in good order, at their expense, the public roads or private ways established pursuant to law, where crossed by their several roads, and build suitable bridges and make proper excavations or embankments, according to the spirit of the road laws." In this section, for the first time, appears the expression, "or private ways established pursuant to law," which follows the words, "public roads." As this is the first reference to private ways, and as the words "public roads," without any qualifying expression, can be traced directly to the act of 1838, it is to be presumed that they were used in the code exactly in the same sense in which they were used in the act of 1838, and that the qualifying expression applies only to the words "private ways." The duty of maintenance of public-road crossings, therefore, under the code, is the same duty that arose under the act of 1838, and applies to all public roads of any kind and nature whatsoever. And even if the words "established pursuant to law" would have the effect to classify

public roads into roads established by the General Assembly, and by the ordinary, and by county commissioners, into one class, and public roads established in other ways into another class, the words "public roads," used in the code evidently in the broad and comprehensive sense of "highways," embrace every public road of every class.

The provisions in reference to the blow-post and the duty of the engineer on reaching such posts, taken from the acts of 1852 and 1859, are found in the Civil Code, §2222, in the same language as they appear in the Code of 1863, §680. The section is connected with the preceding sections by the use of the words "said roads." That is, the effect of the codification was to provide that the provisions of the acts of 1852 and 1859 should be applicable to every road to which the act of 1838 applied. And all three of the acts in the original applied to each and every public road in the State. Though there were some other changes made by the codifiers in the provisions of what we now call the "blow-post law," they are not material to the present discussion. For instance, under the code, the superintendent, instead of the president and directors, is made indictable for failure to erect a blow-post. Civil Code, §2223. The engineer is still indictable for a failure to blow the whistle and check the speed of the train. But by an act passed in 1875 (Acts 1875, p. 17), the tolling of the bell of the locomotive is declared to be a compliance with the act when the train is within the limits of a municipal corporation. While the duty of maintenance applies, since the Code of 1863, to "private ways established pursuant to law," the duty as to blow-posts and giving signals and checking the train upon approaching the crossing does not apply to private ways. *Ga. R.* v. *Cox,* 61 *Ga.* 455.

So far as we have been able to find, there is no direct ruling by this court that the words, "established pursuant to law," apply to private ways and do not qualify public roads. There are expressions used in a number of opinions which would indicate that it was in the minds of the judges who prepared the opinions that these words qualified both "public roads" and "private ways." See *Comer* v. *Shaw,* 98 *Ga.* 543; *Ga. R. Co.* v. *Partee,* 107 *Ga.* 791; *Ga. R. Co.* v. *Cromer,* 106 *Ga.* 296; *Ga. R. Co.* v. *Cox,* 61 *Ga.* 455; *Willingham* v. *Macon & B. Ry. Co.,* 113 *Ga.* 377. There are also expressions in some of the opinions leading to the conclusion that a

64

public road established pursuant to law would be only a road laid out by the General Assembly or by the positive action of the county authorities, and that the provisions of the blow-post law apply only to such roads, that is, roads of such a character that their existence can be shown as a matter of public record. The writer has for a number of years entertained this view, that is, that the blow-post law had no application to a public road which was not of record in some public office where the law provides for public roads to be recorded or registered. When he prepared the opinion in *Ga. R. Co.* v. *Cromer,* 106 *Ga.* 296, he entertained the view that the words, "established pursuant to law," qualified both "public roads" and "private ways," and that "public roads" thus qualified were roads the existence of which could be shown by a public record. The case just referred to involved a road which had been in existence as a highway for a century or more, and still the case was tried in the superior court and disposed of in this court on the theory that the "blow-post" law was not applicable, for the reason that the existence of the road as a public road did not appear of record in the county records or elsewhere. The present investigation into the history of the law requiring railroad companies to keep in good order the public-road crossings, and regulating the manner in which trains should be operated over the crossings, has constrained the writer to abandon his former views in reference to the matter, and brought him to the conclusion that the purpose of the act of 1838, and of the acts of 1852 and 1859 in reference to the manner in which railroad trains should be operated over public-road crossings, was to require railroad companies to take the precautions specified by those acts, wherever there was a public road crossed by a railroad, without reference to how such public road became a public road,—whether it became so by the public using the same and the county authorities keeping it in repair for such a length of time that it was to be treated by the law as a public road, or whether it was established as a public road in a more formal manner and registered and recorded as such. It is certain that a road may become a public road when it has been used by the public and worked by the public authorities for twenty years, and it is unnecessary now to determine whether a use by the public and a working by the public authorities for a less period would make a road a public road. A public road can come into existence by

public use and public work, and when such use and work are continuous for twenty years it is certainly a public road so far as the right of the people to use the same as a highway is concerned. See *Sav. Ry. Co.* v. *Gill,* 118 *Ga.* 748; *Habersham* v. *Sav. Canal Co.,* 26 *Ga.* 665; *Branan* v. *May,* 17 *Ga.* 136. The act of 1838 was intended to require railroad companies to keep in repair crossings at highways, that is roads used by the public. The acts of 1852 and 1859 were to protect the users of the highways where the highways crossed the railroads. And at last the controlling and material question is, not so much where is the public record which identifies the public road, but does a highway exist which is used by the public, which is being worked by the public, and in the use of which danger to the public results when a railroad crosses the same? The purpose of the blow-post law was to prevent, as far as possible, such accidents as occurred in Monroe county in 1851, and there is nothing in the act of 1852 or 1859, or in the code to indicate that there was in the legislative mind, at the time when these acts were passed, the idea of a classification of public roads, either as to their width, or as to the manner of their creation or otherwise. The existence of the public road over the railroad was the thing which was calculated to bring about casualties of the character intended to be prevented. Where the public are crossing railroad tracks and where they have a right to cross them, the danger exists, and the blow-post law was intended to protect them at these points.

In reaching the conclusions just stated we have not been unmindful of the fact that the code declares, "All roads laid out for public use by an act of the General Assembly, if not otherwise provided, or by an order of the ordinary, are declared to be public roads" (Pol. Code, §509), nor of the various provisions following the section just quoted, which relate to the width of roads, and the manner of laying out, altering, and working the same. Nor have we overlooked that section of the code which declares, "All public roads established without a substantial compliance with the provisions of the last named sections are void." Pol. Code, §523. The act of December 4, 1799, declared "All the roads in the several counties of this State that have been laid out by virtue of any act of the General Assembly, or by virtue of any order of court, are hereby declared to be public roads." Cobb's Dig. 943. It will be at once seen that the section of the code first above quoted is a

mere codification of this act. In making this declaration the legislature did not intend to declare the roads established by the General Assembly, or by the order of court, were the only public roads, but the purpose was to make all public roads belonging to either of these classes public roads of the State without reference to other considerations. It was never intended by this act to abrogate the well-settled rule of the common law, that a public road might come into existence by prescription. In *Branan* v. *May, 17 Ga. 136,* a decision delivered in 1855, Judge Lumpkin said: "This was a public road existing by prescription, and consequently required no written authority emanating from the inferior court to prove its existence as a highway." In that case the plaintiff was suing the defendant for the value of two mules alleged to have been drowned, by reason of defendant's erecting a mill-race across the public road without authority of law. The court admitted evidence of the use of the road as a highway. The objection was that there was higher evidence,—the order of the inferior court.

A road established by the General Assembly is a public road. A road established by the proper county authorities is also a public road. A road established by prescription is no less a public road. That is, when for a period of twenty years the public have been accustomed to travel a road, and the authorities of a county having charge of the working and repairing of roads work the same, and keep it in repair, the road becomes a public road so far as the rights of the public are concerned.

We have not failed to consider the argument of counsel as to the inconvenience which might result to railroad companies in determining when a road is such a public road as that the blowpost law must be complied with, but the inconvenience resulting to the railroad companies is no greater than the inconvenience resulting to any citizen who may desire to use the road in some way by which the public may be inconvenienced, as was *Branan's* case, where the mill owner erected his mill-race across the highway. If the road is a public road of record, that is, a road established by the General Assembly, or by an order entered upon the county records, the traveling public must be protected by the erection of a blow-post, and by the engineer's complying with the provisions of law relating to public-road crossings; and they are equally entitled to protection at any other public-road crossing, no matter how the

road came into existence as a public road. When the railroad company fails to erect a blow-post at the crossing, it so fails at its peril, if the road crossed is in fact a public road of any class. The company's failure to erect blow-posts would render the company liable to any one injured as a result of such failure. That provision of the Political Code which declares void roads not laid out in a given manner does not have the effect to destroy the rights of the public in a road established by dedication or prescription. If the county authorities attempt to lay out a public road and do not comply with the provisions of the code, then the road is void, and the county authorities are under no obligation to work the same and keep it in repair. But if the road be actually laid out, though not in conformity to law and even in violation of the law, and it be actually worked by the county authorities, and used by the public for a period of twenty years, the road becomes a public road of this State, not by virtue of the irregular order of the court, but by virtue of public use and public work in maintaining it for the period referred to. The foregoing discussion disposes of all of the assignments of error in the motion for a new trial which relate to the admission of evidence in reference to the use of the road by the public, and the charge of the court as to the duty of the engineer in giving signals and checking his train as it approached the crossing.

5. The court instructed the jury, in substance, that if they found that the road crossed by the railroad was a public road, and the company had failed to erect blow-posts four hundred yards on each side of the crossing, this failure would be negligence on the part of the railway company. This portion of the charge was assigned as error for the reason that there was nothing in the petition complaining of negligence resulting from the failure to erect a blow-post at the crossing. If a railroad company fails to erect a blow-post at a public-road crossing, the superintendent of the company is indictable, and the railroad company is negligent; and the judge is authorized to instruct the jury that a failure of the company to comply with the law in reference to erecting blow-posts would be negligence as a matter of law. If the company erects the blow-posts and the engineer fails to give the signals and check the train as required by law, the engineer is negligent, the railroad is negligent, and the engineer is indictable. But the superintendent would

not be indictable. If the company fails to erect the blow-posts, the superintendent is indictable. The engineer would not, under such circumstances, be subject to indictment for failure to give the signal of approach to the crossing, for the essential element in the crime would be lacking; that is, a failure on his part to give a signal at a post erected at a proper place. While the engineer would not be indictable for failing to give a signal in approaching such a crossing, such failure on his part would be negligence on the part of the railroad company; and the judge would be authorized to instruct the jury, as matter of law, that the failure of the engineer to give the signal was negligence, as well as to give an instruction that, as matter of law, the company would be negligent in failing to erect the blow-posts. In other words, as matter of law, the company is negligent in the failure of the superintendent to have the blow-posts erected; and the conduct of the engineer, resulting from this negligent act of the company, would be, as matter of law, negligence on the part of the company. It is apparent, from an examination of the petition, that it was the intention of the pleader to state a case of negligence resulting from a failure of the company to comply with the provisions of the blow-post law. While the petition does not allege that there was a blow-post on each side of the crossing, the petition does distinctly allege that the road was "a legally recognized public road" and "was so recognized" by the defendant. The failure of the engineer to sound the whistle and check the train on the approach to the crossing was negligence on the part of the company, without reference to the presence of blow-posts. The charge complained of was pertinent and authorized by the pleadings. The evidence authorized the verdict, and no sufficient reason has been shown for reversing the judgment.

*Judgment affirmed. All the Justices concur, except Evans and Beck, JJ., disqualified.*